HERMAN LOEWENSTEIN v. UNITED STATES (No. 3787)[1]

United States Court of Customs and Patent Appeals, December 10, 1934

Brown & Carter (Allan R. Brown and Fred J. Carter of counsel) for appellant.

Joseph R. Jackson, Assistant Attorney General (Marcus Higginbotham, Jr., and Ralph Folks, special attorneys, of counsel), for the United States.

[1] T. D. 47425.

434

[Oral argument October 8, 1934, by Mr. Brown and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This appeal involves a construction of subparagraphs (c) and (g) of paragraph 1530 of the Tariff Act of 1930, under the provisions of which sixteen dozen skins of kid leather were assessed with duty by the collector at the port of New York at 25 per centum ad valorem. Said subparagraphs (c) and (g) read as follows:

Par. 1530 * * *

(c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem; vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins), 10 per centum ad valorem; *any of the foregoing if imported to be used in the manufacture of boots, shoes, footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, 10 per centum ad valorem.* (Italics ours.)

* * * * * * *

(g) The Secretary of the Treasury shall prescribe methods and regulations for carrying out the provisions of this paragraph.

The importer protested the classification, claiming the merchandise dutiable at only 10 per centum ad valorem by virtue of the last-quoted and italicized portion in said subparagraph (c). Other claims were made which are not pressed here and require no consideration by this court.

The United States Customs Court overruled the protest, and from the judgment overruling said protest appellant has appealed here.

Notwithstanding the language used in the report of the collector and the answer to the protest, which are found in the record, the Government concedes that the issue in this case is as follows:

Did Congress intend by the language in paragraph 1530 (c), that is, "* * * any of the foregoing if imported to be used in the manufacture of boots, shoes, footwear, * * *" to include and cover leather that may have been imported for that purpose but was never actually so used? The Government asserts that the intent and meaning of the above-quoted words of said paragraph are that in order for an importer to obtain the lower rate of duty of 10 per centum ad valorem therein provided for, the imported leather must actually *be used* in the manufacture of boots, shoes, or footwear.

The trial court had before it the testimony of one witness, Herman Loewenstein, appellant, and a stipulation of facts entered into by the attorneys for appellant and appellee. The stipulation refers to certain affidavits which are found in the record. The first one is to the effect that from the time of the purchase of the leather it "was not intended

to be used for any other purpose and said leather is to be delivered to a shoe manufacturer for the purpose herein stated".. The second affidavit is the affidavit of the importer showing his sale to certain persons of parts of the imported leather with the statement that it was sold to those concerns for the making of shoes.

The facts, which are shown by the testimony of Mr. Loewenstein, the stipulation, and the affidavits, are not in dispute and are as follows: The importation in question consists of 96 dozen kidskins, 80 dozen of which skins were sold to shoe manufacturers and actually used in making shoe linings, they being too light or otherwise unsuitable for other portions of shoes. As to the remaining 16 dozen skins, importer notified the collector he was exporting them and that he was unable to make proof of their actual use in making shoes; that the 16 dozen skins which were exported were of the same kind as the 80 dozen skins which were actually used for making shoes; that the 16 dozen skins were imported with the same intent as the 80 dozen skins and were a part or a portion of the entire lot of 96 dozen skins. The regulations which required a showing of actual use of the skins in the manufacture of shoes are pointed out by appellant as being T. D. 44439, dated December 6, 1930, and are found in article 485 of the Customs Regulations of 1931. The importation and entry in this case were made on August 26, 1930, five months prior to the date of said T. D. 44439. The said regulations provided for the giving of a bond upon entry and the production upon entry of an affidavit of intent on the part of the importer, and for the later production of an affidavit of the superintendent or manager of the manufacturing plant that the leather was actually used in the manufacture of boots, shoes, or other footwear, etc. Said T. D. 44439 also prescribed that actual use within one year must be shown. Article 485 provides that proof of actual use must be furnished within three years from the date of entry. It is stated in the stipulation that the 16 dozen skins, at the time of importation, were treated by the collector exactly as were the other 80 dozen skins. As to the 80 dozen skins, which were actually used in making shoes, the said regulations were complied with by importer, and on said skins he was required to pay a duty of 10 per centum only. Witness Loewenstein states (and this subject matter might be important in view of the weight and effect to be given to one of the decisions hereinafter discussed) that he was in the business of importing and exporting shoe leather, and during his forty years of experience has never imported any other kind of leather; that he ordered the importation as shoe leather; that he did not manufacture shoes, but that he intended to sell the leather to shoe manufacturers after importation; that the 80 dozen skins referred to were imported to be sold for outsides of shoes, that is, for shoe uppers, and that he sold about 75 per centum of them for linings for shoes,

but that all of the 80 dozen were used for shoe purposes; that he made "lots" of efforts to sell the remaining 16 dozen for shoe purposes, both in New York City and in St. Louis; that the leather was "too thin and too small" to suit the manufacturers, and that it was not fit for making high-grade shoes; that some of the merchandise which was sold to American shoe manufacturers was returned and again resold; that such returned leather was resold for lining purposes; that it was intended that it be "sold at 75 cents and we sold it at 20 cents"; that the 16 dozen skins were returned to the tanner in Florence, Italy.

Appellant, in support of his contention that the judgment of the trial court should be reversed, makes contentions which may be stated in the order presented as follows:

1. That the leather is such leather as is provided for in said subparagraph (c) and that the record clearly shows that it was "imported to be used in the manufacture of * * * shoes"; that the intent of the importer at the time of importation is controlling; that, by the use of the last phrase in subparagraph (c), Congress meant that the intent at the time of importation should be alone controlling, is evidenced by the use by Congress, in paragraph 1101(a) of the same act, of language making the actual use of wool the determining factor in controlling its dutiable status.

2. That any regulation or instruction of the Secretary of the Treasury which requires that the importer of the leather involved here must show that such leather was actually used in the manufacture of footwear in order to secure the 10 per centum duty provided in said paragraph is a nullity in that it would be an alteration or amendment of the revenue law and would be imposing a condition not found in the law itself.

3. That even if the regulation were valid, the failure of the appellant to comply with it would be no justification for said action of the collector, for the reason that at the time of importation no regulation making such a requirement had been issued or was in effect.

The decision of the trial court is predicated, as we understand it, mainly upon the proposition that Congress by the use of the word "methods" in said subparagraph (g) of paragraph 1530, recognized that the provision as worded could not be "self-operative", and that Congress had in mind granting to the Secretary just such authority as was exercised in requiring that actual use be shown. As we understand the trial court's decision, the court held that a letter of July 28, 1930, referred to in said regulation promulgated on December 6, 1930, was in force and effect and was a valid regulation, citing *Gallagher & Ascher* v. *United States*, 14 C . Cust. Appls. 38, T. D. 41548, which holds in effect that regulations made by the Secretary of the Treasury under authority granted in a tariff act were not required to be printed in any particular form or place.

The gist of the Government's argument is that the trial court, for the reasons there assigned, correctly overruled the protest; that the said regulations were valid for the reasons assigned by the court, but that "even if no regulations had been issued or existed", appellant would have to establish by some competent proof that the imported leather *was used* in the manufacture of footwear before it would be entitled to the lower rate.

In support of importer's first contention, two cases are cited and relied upon. The first case is *E. Dillingham, Inc.* v. *United States*, T. D. 43957, 57 Treas. Dec. 547. In that case the Third Division of the United States Customs Court sustained the protest of the importer against the assessment of duty on a registered bull. The collector refused free entry for the reason that the bull was slaughtered for beef soon after importation. The importer claimed that it was imported specially for breeding purposes. It was shown that the party to whom the bull was to eventually go had two small boys on the farm, and he refused to buy the bull because it was too large and too ugly. The party to whom the bull was to be sold stated that he had given an order for it and that he intended to use it for breeding purposes. Paragraph 1506, Tariff Act of 1922, there at bar, read:

> Any animal imported by a citizen of the United States specially for breeding purposes, shall be admitted free, whether intended to be used by the importer himself or for sale for such purposes * * *.

The United States Customs Court, in holding the bull free of duty, relied largely upon the case of *United States* v. *One hundred Ninety Six Mares (Rust, Claimant)*, 29 Fed. 139. The *One Hundred Ninety Six Mares* case, *supra*, was decided in 1886 by Circuit Judge Turner who was judge of the Circuit Court of the Western District of Texas. The claimant, Rust, went to Mexico and exported into the United States the mares in controversy, claiming that the mares were desired for breeding purposes. Sometime afterwards, information was conveyed to the customs officers that said mares were intended to be placed upon the market and sold whenever a proper opportunity presented itself. By direction of the customs officers the mares were seized as forfeited to the United States on the ground of fraud practice upon the customs. The district attorney filed his libel, seeking to have the mares condemned and forfeited to the Government for nonpayment of duties. Rust filed his claim denying the fraud. The mares were sold by order of the court and the proper disposition of the proceeds was the question in the case. The statute there under consideration was as follows:

> Animals specially imported for breeding purposes, shall be admitted free upon proof thereof satisfactory to the secretary of the treasury, and under such regulations as he may prescribe.

The following language is found in the decision:

\* \* \* Nor does this interpretation embrace the idea that a party importing for breeding purposes could never sell and dispose of such animals, but does imply that the intent and purpose of the importer was, at and before the importation, to use them for the purpose of breeding. I can well imagine how a man who in good faith imported animals for breeding could, under a change of circumstances, be justified in making sale of property thus situated. Suppose some unforeseen accident, misfortune, or other calamity overtook or beset him, or change in circumstances rendered it incompatible with his intention to devote them to breeding purposes, it could not be insisted that this changed condition of affairs could relate back to and affect the *bona fides* of his intention at the time he made the importation. No court would sanction such an unjust interpretation of the law.

It will be observed that the court concluded that the issue to decide was the question of what was intended by the party who imported the mares, and held that the case should be put to the jury solely upon the question of the *bona fides* of intention.

It is our view that neither of the cases last above referred to is controlling of the decision of the issues here presented. As to the case decided by the Third Division of the Customs Court, it is sufficient to say that the decision rests mainly upon the said *One Hundred Ninety Six Mares* case, *supra.* The decision of the trial court in the case at bar makes no reference to either one of the above-mentioned decisions, and it is not shown in the record before us that said decisions were called to the attention of the court either at the trial or in the motion for rehearing.

Paragraph 1506, Tariff Act of 1922, under consideration in the *Dillingham* case, *supra,* is different in at least two respects from the leather paragraph under consideration here. There, animals "imported \* \* \* specially for breeding purposes" were admitted free under certain *regulations* which the Secretary of Agriculture might prescribe, and such additional regulations prescribed by the Secretary of the Treasury as might be required. In the instant case, said paragraph 1530 (c) requires that the goods be assessed with only 10 per centum duty "if imported to be used in the manufacture of \* \* \* shoes [etc.]", subject to such *methods* and regulations as shall be prescribed by the Secretary of the Treasury for the carrying out of the provisions of the paragraph.

As to the *One Hundred Ninety Six Mares* case, *supra,* it is at once noticeable that there is also some distinction to be made between the tariff provision there under consideration and the one at bar. There was no authorization in the tariff paragraph under consideration in the *One Hundred Ninety Six Mares* case, *supra,* for the Secretary of the Treasury to prescribe *methods* for carrying out the provision. Moreover, we are not impressed that the reasoning of the judge as above quoted applies aptly to the facts at bar. We think that Congress never intended to make the dutiable status of the merchandise

at bar depend solely upon the fact of whether or not the importer intended at the time of ordering and importing the merchandise to sell it to some prospective customer for shoe-making purposes or to use it himself for such purposes. If intent alone controlled, it would make no difference whether the merchandise at bar was exported or whether it was sold in this country for other than shoe-making purposes. As far as the issues in this case are concerned, if intent alone controls, the duty status of the leather would be the same if the appellant had sold it for the making of ladies' purses.

It is very clear to us that Congress sought to place the low rate of 10 per centum upon shoe leather so as to cheapen the price of shoes or to favor the American shoe manufacturer or both, and that it did not intend it to apply to leathers of the same class otherwise used in this country. It taxes our credulity unduly to believe that notwithstanding the fact that Congress provided a 25 per centum duty on certain kinds of leather for the purpose of protecting the American leather industry (see Senate Finance Committee Report on H. R. 2667 which became the Tariff Act of 1930, and the preamble of said act) it at the same time intended that a change of intent on the part of the importer would permit leather imported at the duty of 10 per centum to come in direct competition with such leather.

The contentions of appellant lead to the conclusion that as long as the importer intends, at the time of importation, to sell his goods for shoe-making purposes, it does not make any difference if he changes his mind the next day and sells them for a wholly different purpose. Surely Congress could not have contemplated a result which might lead to unlimited fraud against the revenues and which might defeat the very purpose of the 25 per centum duty and not further the purpose of the lower-duty provision.

The fact that in this case it seems to be clearly shown that Mr. Loewenstein honestly intended when he ordered the merchandise to sell it to some prospective manufacturer and in good faith imported it with that intent does not alter the situation. Congress meant that there had to be a showing of more than mere intent at the time of importation. It sought in some manner to reach and apply the low provision so as to further the obvious purposes of the enactment of the paragraph. In order that this be done it was necessary and proper to authorize the Secretary of the Treasury to provide methods and regulations. Whether by use of the term "methods and regulations" Congress meant more than mere regulations is in our view immaterial, as far as the issue in this case is concerned. The importer could not escape the burden of proving something more than intent at the time of importation, regardless of whether there was or was not any regulation in existence.

In view of the considerations heretofore enumerated, and having arrived at the conclusion that Congress did not intend that the dutiable status of imported leather should be controlled solely by the intent of the importer, if such importer subsequently changed his mind, and sold the leather in this country for other uses, the question is presented: Just what must the importer prove in order that he may be entitled to the 10 per centum shoe-leather rate of duty. It is pertinent to ask what requirements can this court suggest without legislating, which is not a prerogative of judicial tribunals. Congress has used language which this court is called upon to interpret and must interpret in order that the issue be decided. Since the interpretation urged by the importer is, in our judgment, wholly inconsistent with the manifest purpose of the provision, we feel fully warranted in saying that Congress never intended to extend the said 10 per centum ad valorem duty to an importer of leather, unless it were shown that said leather was used in this country in such a way as to promote the purposes of the provision. How could the purpose Congress had in mind be furthered except by the consumption of leather in the making of the articles mentioned in the last clause of the paragraph? Having arrived at this conclusion, it necessarily follows that before the importer was entitled in the instant case to the 10 per centum ad valorem rate of duty on his leather, he should show that the same was actually used "in the manufacture of boots, shoes, footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear."

We recognize the force of appellant's contention that Congress could have used more apt language than it used in the paragraph under consideration to bring about the result which we here hold it intended, and that our holding results in giving the phrase "to be used", found in the paragraph under consideration, and the terms "have been used" and "are used", in said paragraph 1101(a), the same meaning. Tariff laws not infrequently involve situations like the one at bar. This is due to the complexity of tariff enactments, the vast number of articles and subjects treated, to the fact that in the preparation and enactment of such laws recommendations from various sources, embodying different kinds of expressions, are presented, and to the further fact that changes are made in the bill in the committees, and amendments thereto are made by both legislative bodies. Obviously, certain expressions find their way into bills, and amendments are often made without such an examination or investigation of the bill as a whole as would bring to the attention of the legislators the various similar and dissimilar expressions used throughout the bill. It would indeed be surprising, under such circumstances, if different expressions meaning the same thing, did not frequently appear in the

finished law. While it is true that courts often, where expressions like those above referred to are used, feel required to hold that such expressions are not used in the same sense, we, for the reasons stated, do not feel that we would be justified in construing the term "to be used", in controversy here, to mean other than is above indicated.

It has been suggested that the contention of the Government and the position of the trial court would require that the 25 per centum ad valorem duty be levied in the case at bar if the merchandise after importation had been entirely destroyed by fire, flood or other casualty, after it had been sold in this country for use in the manufacture of footwear. Unquestionably this would be true, but when we consider the purpose which prompted Congress to extend the low rate of duty, the result suggested is not out of harmony with the results which ordinarily obtain with relation to all imported dutiable merchandise. One who imports merchandise and pays duty thereon necessarily runs the risk of losing his goods after importation, and the fact that he does lose them after they have left customs custody in no sense entitles him to have his duty returned.

The protest was properly overruled and the judgment of the trial court is *affirmed*.